BENJAMIN C. MIZER
Acting Assistant Attorney General
JONATHAN F. OLIN
Deputy Assistant Attorney General
MICHAEL S. BLUME
Director, Consumer Protection Branch
RICHARD GOLDBERG
Assistant Director, Consumer Protection Branch
SANG H. LEE
Trial Attorney, Consumer Protection Branch
U.S. Department of Justice
    450 Fifth Street, NW, Suite 6400-South
    Washington, D.C. 20001
    Telephone:  (202) 616-0219
    Facsimile:  (202) 514-8742
    E-mail:    Sang.H.Lee@usdoj.gov

STEPHANIE K. YONEKURA
Acting United States Attorney
LEON W. WEIDMAN
Chief, Civil Division
ANOIEL KHORSHID
Assistant United States Attorney (California Bar #223912)
    300 N. Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone:  (213) 894-6086
    Facsimile:  (213) 894-7819
    Email:    Anoiel.Khorshid@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | )  No.: CV 15-00394 |
|     Plaintiff, | ) |
| | )  COMPLAINT FOR CIVIL |
|     v. | )  PENALTIES, PERMANENT |
| | )  INJUNCTION AND OTHER |
| PLAZA BANK, | )  EQUITABLE RELIEF |
| | ) |
|     Defendant. | ) |
| | )  [12 U.S.C. § 1833a, 18 U.S.C. § 1345] |

Plaintiff, the United States of America, by its undersigned attorneys, alleges as follows:

1.      This is an action for injunctive relief and civil penalties by the United States of America against Plaza Bank ("Plaza," "the Bank," or "Defendant").

2.      Shortly after its founding in 2005 to its sale in June 2009, Plaza knowingly permitted fraudulent merchants, acting through an intermediary called a third-party payment processor, to illegally withdraw millions of dollars from consumers' bank accounts.   When Plaza's chief compliance official raised concerns about the numerous warning signs of fraud, such as a high number of returned transactions, as well as complaints from consumers and other banks, she was brushed aside by Plaza's Chief Operating Officer—who, unknown to the compliance officer, also happened to be a part-owner of the payment processor. Plaza thus continued to give fraudsters unfettered access to the bank accounts of tens of thousands of consumers.

3.      When Plaza was purchased in 2009, its new management soon realized that the Bank was allowing merchants to make unauthorized withdrawals from consumers' accounts.   Rather than immediately terminate or suspend this activity, Plaza officials spent months debating whether the revenues these transactions were generating outweighed the possible risk to the Bank.   Only after hundreds of thousands of transactions were returned, more than a thousand consumer victims complaints about unauthorized withdrawals reached Plaza, and tens of millions of additional dollars had been withdrawn from consumer accounts did Plaza finally decide to terminate the relationship.

## I.    JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1345 (United States as plaintiff).

5.      Venue is proper in the Central District of California pursuant to

28 U.S.C. § 1391(b) because defendant Plaza operates and maintains its management offices and its operations center in this district, and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.

## II.   PARTIES

6.     Plaintiff is the United States of America.

7.     Defendant Plaza is a banking corporation established in 2005 under the laws of California.

8.     Plaza is a federally-insured financial institution that maintains its principal executive office at 18200 Von Karman Ave, Irvine, CA 92612.

9.     Plaza is regulated by the Federal Reserve Bank of San Francisco and the Division of Financial Institutions of the California Department of Business Oversight.

10.     As of September 30, 2014, Plaza had total assets of approximately $525 million.

## III.   RELEVANT STATUTES

**A.   The Financial Institutions Reform, Recovery, And Enforcement Act.**

11.     The United States seeks civil money penalties from Plaza under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA"), which Congress enacted as part of a comprehensive legislative plan to reform and strengthen the banking system and the federal deposit insurance system that protects the public from bank failures.   Toward that end, FIRREA authorizes civil enforcement for violations of enumerated, predicate federal criminal offenses, including wire fraud affecting a federally-insured financial institution.   Plaza's actions affected dozens of federally-insured financial institutions whose customers were defrauded as a result of Plaza's actions.   In addition, Plaza itself was and is a federally-insured financial institution and was

affected by its own unlawful conduct.   See, e.g, United States v. Bank of New York Mellon, 941 F. Supp. 2d 438, 461-63 (S.D.N.Y. 2013); United States v. Countrywide Fin. Corp., 961 F. Supp. 2d 598, 606 (S.D.N.Y. 2013); United States v. Wells Fargo Bank, N.A., 972 F. Supp. 2d 593, 630 (S.D.N.Y. 2013).

12.   FIRREA's penalty provisions provide that the United States may recover civil money penalties of up to $1.1 million per violation, or for a continuing violation, up to $1.1 million per day or $5.5 million, whichever is less.   See 12 U.S.C. §§ 1833a(b)(1), (2); 28 C.F.R. § 85.3.   The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.   See 12 U.S.C. § 1833a(b)(3).

**B.   The Anti-Fraud Injunction Act.**

13.   The United States seeks statutory equitable relief under Title 18, United States Code, Section 1345.   Section 1345 authorizes the government to commence a civil action to enjoin enumerated, predicate federal criminal offenses, including wire fraud.

14.   Wire fraud is committed by sending a "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."   18 U.S.C. § 1343.

**IV.   CONSUMER FRAUD IN THE 21ST CENTURY:   HOW FRAUDULENT MERCHANTS ACCESS THE ELECTRONIC BANKING SYSTEM AND STEAL MONEY FROM UNSUSPECTING CONSUMERS**

**A.   Federal Law Requires Banks To Know Their Customers.**

15.   Federal law requires Plaza, like all banks in the United States, to have an effective program in place to assure that the Bank knows the identities of its customers and understands the nature of its customers' business activities, as well as

to prevent illegal use of the banking system by the Bank's customers.   <u>See</u> <u>generally</u> Bank Secrecy Act, 31 U.S.C. § 5311 <u>et seq.</u>; USA Patriot Act, § 326, 31 U.S.C. § 5318; 31 C.F.R. § 1020 <u>et seq.</u> (formerly 31 C.F.R. § 103 <u>et seq.</u>).   Such programs are designed to prevent banks from providing access to the national banking system to entities engaged in unlawful activity.

16.   Because of such requirements, many fraudulent merchants have difficulty obtaining bank accounts from which they can access the national banking system.

17.   During the relevant time period of its misconduct, Plaza was required to conduct meaningful due diligence investigations of new clients at the time of a new account opening.   <u>See</u> 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, <u>et seq.</u>).

18.   In conducting a meaningful "know-your-customer" analysis, Plaza was required to collect information sufficient for the Bank to determine whether a client poses a threat of criminal or other improper conduct.

**B.   The Relationship Between Third-Party Payment Processors, Banks, And Consumers.**

19.   Third-party payment processors are intermediaries between banks and merchants.   Third-party payment processors open bank accounts in their own names and use these accounts to conduct banking activities on behalf of their merchant-clients.   Typically, the merchant-client does not have a direct relationship with the bank when a third-party payment processor is involved.   Rather, the bank interacts with the third-party payment processor, which in turn interacts with the merchant.

20.   Customers of third-party payment processors often are legitimate businesses.   In some cases, however, customers of third-party payment processors are fraudulent merchants that do not or cannot open their own bank accounts because banks will not do direct business with them.   Thus, these

fraudulent merchants must rely on third-party payment processors to access the nation's banking system.   At a merchant-client's direction, the processor will initiate debit transactions against consumers' accounts through its banking account and transmit the consumers' money to the fraudulent merchant.

21.   Given the strict rules in place requiring banks to know their customers and have an effective Bank Secrecy Act/Anti-Money Laundering compliance program, bank regulators have warned banks about the risks associated with providing certain banking services to third-party payment processors (and by proxy their merchant-clients).

22.   As early as 2008, bank regulators have urged banks to ensure that they are not abetting consumer fraud by taking particular precautions when dealing with payment processor customers.   These steps have included:

a.   monitoring all transaction returns (unauthorized returns and total returns);

b.   reviewing the third-party payment processor's promotional materials to determine its target clientele;

c.   determining whether the third-party payment processor re-sells its services to other entities;

d.   reviewing the third-party payment processor's policies and procedures to determine adequacy of merchant due diligence;

e.   reviewing main lines of business and return volumes for the third-party payment processor's merchants; and

f.   requiring that the third-party payment processor provide the bank with information about its merchants to enable the bank to assure that the merchants are operating lawful businesses.

**C.   Fraudulent Merchants Working With Third-Party Payment Processors Can Exploit Advances In Banking Technology To Harm Consumers.**

23.   Most consumers are familiar with the typical process for paying

6

for items by check:   the consumer (the "payor") signs a check from his or her bank and delivers it to the merchant (the "payee").   The merchant deposits the check in the merchant's bank, and the merchant's bank then withdraws funds from the consumer's bank.

24.    A demand draft (also called a Remotely Created Check or RCC) is a check created not by the account holder but rather by a third party using the account holder's name and bank account information.   Unlike ordinary checks, demand drafts are not signed by the account holder.   In place of the account holder's signature, a demand draft contains a statement claiming that the account holder has authorized the check.   For example, some demand drafts, including those deposited at Plaza, include a legend stating "Draft Authorized For Internet Purchase. Authorization On File."[1]

25.    Banks require that, before creating and depositing a demand draft, the originating merchant must have:   (1) a consumer's bank routing number; (2) the consumer's bank account number; and (3) proof that the consumer authorized the transaction.   The merchant or third-party payment processor then creates an electronic check in the name of the consumer and deposits it in the merchant's—or payment processor's—own bank account.

26.    Prior to 2003, the payee was required to create a paper demand

---

[1] Demand drafts are notorious in the banking industry and consumer protection community for their use as instruments of fraud.   In 2005, in response to a request for public comment, America's Community Bankers, a prominent industry group that later merged with the American Banking Association, wrote to the Board of Governors of the Federal Reserve and the FDIC that "the number of unauthorized remotely-created demand drafts has become a significant problem" because of the "level of fraud and abuse associated with remotely created checks."   That same year, the Attorneys General of 35 states jointly urged the Federal Reserve to eliminate such demand drafts, which are frequently "used to perpetrate fraud on consumers."

draft and physically deposit it at the payee's bank from which point it would enter the national check payment system.   However, in an effort to reduce the burden of handling and maintaining paper copies of checks, in 2003, Congress passed The Check Clearing for the 21st Century Act ("Check 21 Act").   Pursuant to this statute, banks are permitted to process check transactions using electronic images of checks instead of the physical original (i.e., paper check).

27.     Because a Check 21 transaction is premised on the transmission of a digital reproduction of a check, the depositor's bank can withdraw funds directly from a payor's bank account as if a paper check was used via the Federal Reserve Bank's check clearing system.

28.     Due to the absence of a paper copy and the speed by which digital images can be processed between banks, fraudulent merchants working with third-party payment processors can exploit Check 21 Act processing to transfer money from a consumer bank accounts without genuine authorization.   An example of a Check 21 transaction between merchant, consumer, and banks proceeds as follows:

 a.   The merchant will obtain the consumer's bank account information, including the account number and bank routing number, and generate a digital image file of a demand draft.   The face of the demand draft purports that the draft has been created with the consumer's authorization.

 b.   Using remote deposit capability provided by the payment processor, the merchant will electronically transmit the demand draft digital image to the payment processor for deposit.

 c.   The payment processor will send the digital image of the demand draft (or just the payment information contained in the digital image) to its own bank.

 d.   The payment processor's bank will transmit the demand draft digital

8

image via the Federal Reserve Bank's check clearing system to the consumer's bank.   Implicit in this transmission is the claim that the payor (i.e., consumer) authorized the payment to the merchant.

e.   The consumer's bank withdraws money from the consumer's account and transmits that money through the banking system to the payment processor's bank.

f.   The payment processor's bank credits the money into the payment processor's bank account.

g.   The payment processor transmits the money from its own bank account to the merchant.

29.   During this series of transactions, the third-party payment processor's bank receives fees from the third-party payment processor.   The third-party payment processor receives fees from the merchant.   And the merchant keeps whatever money remains from the amount withdrawn from the consumer's account.

30.   Demand drafts are returned through the national banking system like any other checks.   Some checks are immediately rejected by a consumer's bank for a variety of reasons:   the account does not exist, the account is closed or frozen, the account owner has blocked checks to a certain payee, or there are insufficient funds to cover the check (referred to as "NSF").   In most instances, these kinds of returns are processed within one or two days.   Other kinds of returns, including "unauthorized" and "breach of warranty" returns, can be returned over longer periods of time.   These two categories of returns typically require the customer to fill out an affidavit, signed under penalty of perjury, stating that he or she did not authorize the check.

31.   Unlike other payment systems, such as credit cards and ACH transactions, demand drafts are not monitored electronically by any supervisory authority.   Therefore, a bank accepting large volumes of demand drafts for deposit

must analyze rates of returned transactions for the demand drafts it submits to the nation banking system.

### V. FROM ITS FOUNDING, PLAZA KNOWINGLY PERMITTED FRAUDULENT MERCHANTS TO ILLEGALLY WITHDRAW MILLIONS OF DOLLARS FROM CONSUMERS' BANK ACCOUNTS

**A.    Plaza's Founding Chief Operating Officer And Its Chairman Of The Board Each Have Deep-Seated Financial Interests In A Third-Party Payment Processor That Would Soon Become A Vendor And Client Of The Bank.**

32.    Plaza was founded in 2005.   Ten individual founders, each of whom invested in the Bank and in return received an ownership interest, were given a directorship role in the Bank.   Of these ten original directors, only three had any previous management experience in the banking industry.   These three founders assumed the Bank's main executive positions when the Bank became operational in early 2006.

33.    "Plaza COO" was hired as an Executive Vice President and the Bank's Chief Operating Officer.   He held a 3 percent ownership interest in the Bank and was a Bank director.   Prior to helping found Plaza, Plaza COO helped found a third-party payment processor based in Santa Ana, California (referred to herein as "TPPP-1") that would soon become a client and partner of the Bank.   At TPPP-1's inception, Plaza COO invested $100,000 into the processor, which was, at the time, an 11% ownership stake.   Plaza COO and TPPP-1's Chief Executive Officer (referred to herein as "TPPP-1 CEO") had a history of payment processing partnerships dating back to at least as early as 2002.

34.    "Plaza Chairman" owned a 1.5 percent interest in the Bank and became the chairman of Plaza's board of directors.   Plaza Chairman had contributed $100,000 for an 11% ownership stake in TPPP-1.   He served on TPPP-1's board of directors at the same time he was chairman of Plaza's board of directors.

**B.    Lacking The Technical Capacity To Provide Remote Deposit Services, Plaza Outsources This Service To TPPP-1, Which Then Begins Processing Payments For Its Own Merchant-Clients For Whom Plaza Has Done No Due Diligence.**

35.    On or around October 30, 2006, Plaza began its formal relationship with TPPP-1 by hiring the payment processor as a vendor that would provide remote depositing services.   Under the contract, TPPP-1 was required to provide Plaza's account holders with imaging software for remote depositing, maintain records of the transactions, and archive the check images.   TPPP-1 was also responsible for forwarding the record of transactions and archived check images to the regional Federal Reserve Bank, a primary clearinghouse for bank-to-bank transactions and the ACH network.   For these services, TPPP-1 charged Plaza and its customers a fixed rate per transaction.

36.    Plaza COO and his business partner, TPPP-1 CEO, signed the agreement on behalf of the Bank and the third-party payment processor, respectively.   Contrary to Plaza's Employee Handbook and its Conflict of Interest Policy, during the vendor selection process and contract negotiations, Plaza COO did not disclose his financial and ownership interest in TPPP-1 to Plaza's Bank Secrecy Act Officer (referred to herein as "Plaza Compliance Officer") or in his annual disclosure statement.[2]

37.    On July 3, 2007, TPPP-1 opened its first deposit account at

_____

[2]  Plaza's written policies barred bank directors from any activity or association that might compromise or even appear to comprise the directors' judgment to the detriment of Plaza's interests.   Directors were also prohibited from engaging in business dealings with the Bank that were more favorable than available to the general public or could compromise the reputation of the Bank, absent written approval from Plaza's Chief Executive Officer.   Despite these policies, Plaza COO, in an e-mail sent from his Plaza e-mail address to TPPP-1 management, jokingly referred to TPPP-1 as his "master."

Plaza.   Between July 3, 2007, and March 2010, TPPP-1 opened eighteen separate bank accounts at Plaza.   This dual role, as both vendor and account holder (i.e., customer), enabled TPPP-1 to process financial transactions for its own merchant-clients.

38.   At the time that TPPP-1 first opened accounts at Plaza, Plaza's general fee schedule mandated that the Bank charge account holders $10 for processing returned items.   A returned item is a deposit that cannot be processed by the payor's bank; items may be returned for a number of reasons, such as missing signatures, unavailable funds, a stop payment order, or closed accounts.   Returned items also include debits to consumer accounts that are reversed, including those reversed because they were not authorized by the account holder.

39.   Rather than charging TPPP-1 the $10 fee that it advertised for all of its customers, Plaza charged TPPP-1 just fifty cents ($0.50) for each return—a 95% discount.   By comparison, according to a 2002 report to Congress by the Federal Reserve, the average deposit return fee was $7.11 at banks.   Thus, the cost to TPPP-1 when it or its merchants incurred returned items—which in the coming years would number in the hundreds of thousands—was not only lower than the cost for Plaza's other customers, but it was likely much lower than the cost that it would have incurred at other banks.

**C.   Plaza's COO Overrules A Request To Conduct Due Diligence On TPPP-1's Clients.**

40.   Soon after it opened its first accounts at Plaza, TPPP-1 began processing financial transactions for its own merchants-clients using remote depositing.   Specifically, TPPP-1's merchant-clients used electronic check items created by the merchants using consumers' banking information (i.e., demand drafts) to deposit funds in TPPP-1's Plaza accounts.   Once the funds were transferred into TPPP-1's accounts at Plaza, TPPP-1 then distributed money to each of its merchant-clients by withdrawing large lump sums from its Plaza accounts on a

monthly basis and paying out to its clients individually based on the record of its clients' balances that it maintained.

41.     Initially, Plaza Compliance Officer was unaware that TPPP-1 was serving as a third-party payment processor.   She believed that TPPP-1 (as a Plaza vendor) was providing remote depositing services for Plaza's own customers that the Bank had vetted, and that TPPP-1 (as a Plaza customer) was simply depositing and withdrawing its own money.   She was unaware that TPPP-1, acting as a third-party payment processor, allowed its merchant-clients to use remote deposits of demand drafts and other electronic checks to transfer funds from consumers' accounts into TPPP-1's accounts at Plaza.

42.     In early December 2007, Plaza Compliance Officer observed the unusual nature of TPPP-1's transactions, specifically that it was making a number of remote deposits and then making one large lump sum withdrawal.   Once Plaza Compliance Officer understood what TPPP-1 was doing, she realized that TPPP-1's actions violated Plaza's Check 21 Policy, which addressed in part the Bank's obligations under the Bank Secrecy Act and related regulations.   Plaza's Check 21 Policy required Plaza to conduct a thorough background check of any merchant account holder that wanted to use Check 21 services, including remote depositing, so that Plaza could verify the identity, creditworthiness, and business validity of the merchant.   This policy also explicitly prohibited the Bank from permitting third-party payment processors that held deposit accounts at Plaza from using Check 21 services, absent approval from senior management.   Plaza's Check 21 Policy noted that third-party payment processors "are inherently more risky," and that merchants using third-party payment processors "have (in aggregate) displayed a much higher incidence of return items and deposited items returned."

43.     On December 18, 2007, Plaza Compliance Officer contacted TPPP-1 CEO and asked about debits and credits being processed through TPPP-1's accounts at Plaza.   TPPP-1 CEO admitted that not only was it using remote

depositing without approval from Plaza, but that it was also providing these services to its merchant-clients through its accounts at Plaza.   Plaza Compliance Officer informed TPPP-1 CEO that this was inappropriate and should stop until the proper Bank clearance and vetting procedures were fulfilled.   Plaza's Compliance Officer requested that TPPP-1 CEO provide relevant documentation, such as "[merchant] financials" and "history and structure of [the merchant]," so that the Bank could "determine if [it] will agree to offer Check-21 services to your [merchants]."   Plaza Compliance Officer recognized that the Bank needed documentation about these merchants so the Bank could fulfill its "Know Your Customer" and underwriting responsibilities as outlined in its Check 21 Policy.

44.   Before Plaza Compliance Officer could complete due diligence on TPPP-1's merchants, in early 2008, Plaza COO unilaterally approved TPPP-1 to continue processing financial transactions for its merchants through TPPP-1's multiple accounts at the Bank using remote depositing and demand drafts.   TPPP-1 would not have to submit any of its clients to Plaza for due diligence and bank approval.   Plaza COO did not document his decision-making process, and Plaza Compliance Officer was not initially aware of Plaza COO's decision.   In an e-mail to TPPP-1 CEO, Plaza Compliance Officer noted that she had to learn from another bank employee that "TPPP-1 is accepting deposits for [its merchants]" and that "Plaza COO had approved it."

45.   In addition to permitting TPPP-1 to process remotely deposited demand drafts for its merchant-clients, around the same time, Plaza COO also approved TPPP-1 to process ACH debits against consumers' bank accounts for its merchant-clients.   Without any vetting or underwriting of these merchants, Plaza would serve as the Originating Depository Financial Institution for these ACH transactions.

46.   At the time that Plaza COO provided blanket approval for TPPP-1 to process transactions for any of its merchants, he did not disclose to

14

Plaza Compliance Officer or disclose on his annual disclosure statement that he was a shareholder in TPPP-1.

**D.    TPPP-1's Unfettered Access To Consumer Bank Accounts Generates Many Red Flags Of Fraud, But Plaza Chooses To Allow The Unlawful Activity To Continue.**

47.    Once TPPP-1 was approved to process electronic transactions for merchants for whom Plaza had not conducted due diligence, TPPP-1 began increasing the volume of transactions it ran through its accounts.   From approximately the first quarter of 2008 until February 2009, TPPP-1 processed between approximately 1,000 and 22,000 items (i.e., remotely deposited checks) each month for its own merchant-clients.

48.    As TPPP-1's processing volume increased, so did the red flags that many of TPPP-1's merchants were fraudulently withdrawing money from consumers' bank accounts.   As described more fully below, Plaza employees, including Plaza Compliance Officer, observed the following indicators of fraud:

    a.    Of the thousands of withdrawals initiated by TPPP-1's merchant-clients from consumers' accounts, Plaza knew that *approximately half* were being rejected by the consumers' banks as either unauthorized or fraudulent;

    b.    consumers complained of fraud and unauthorized debits, and other banks contacted Plaza regarding unauthorized withdrawals from their customers' accounts; and

    c.    law enforcement made inquiries to Plaza about TPPP-1, its merchants, and Plaza's role in the schemes to defraud.

Although Plaza recognized these warning signs, it deliberately ignored them and continued to permit TPPP-1 and its fraudulent merchants to access the nation's banking system to siphon off consumers' monies.

### i.      High Return Rates

49.     High rates of returned transactions—regardless of the specific reason for the return—indicate potential suspicious activity, especially when coupled with consumer complaints.   While high return rates, in isolation, are not proof of fraud, they are a red flag that a merchant's practices may be deceptive or otherwise dishonest.   In addition to "unauthorized" returns, which represent an explicit claim that a consumer did not authorize a debit, a high rate of "total" returns also indicates potential fraud.   For example, returns due to insufficient funds may reflect consumers who had money taken from their accounts unexpectedly or repeatedly, without authorization.   Returns due to a closed account may reflect consumers who were forced to close their bank accounts as a consequence of unauthorized debits.   As reiterated by FinCEN:

> *Fraud:*  High numbers of consumer complaints about Payment Processors and/or merchant clients, and **particularly high numbers of returns or chargebacks (aggregate or otherwise), suggest that the originating merchant may be engaged in unfair or deceptive practices or fraud**, including using consumers' account information to create unauthorized RCCs or ACH debits.

FinCEN Advisory: Risk Associated with Third-Party Payment Processors, FIN-2012-A010 (October 22, 2012) (emphasis added).

50.     Plaza knew that total return rates for TPPP-1 were remarkably high.   Specifically, return rates between December 2007 and February 2009 for all of TPPP-1's debit transactions hovered between 50 percent and 55 percent. Plaza Compliance Officer observed in a memorandum chronicling the Bank's relationship with TPPP-1 that, during this time period, Plaza had "a difficult time handling the returns caused by these transactions."

### ii.      Complaints From Consumers And Their Banks

51.     Further corroborating the suspicious nature of TPPP-1's

transactions were the numerous credible consumer complaints about unauthorized withdrawals.   One Plaza employee confided in an e-mail to Plaza Compliance Officer that she was aware of "hundreds of calls" complaining of "fraudulent check[s]" by TPPP-1's merchants.

52.   Plaza's records show that by the summer of 2008 the Bank received consumer complaints regarding unauthorized withdrawals originating from Plaza for TPPP-1's merchants.   For example, Plaza learned that:

a.   On September 9, 2008, consumer R.C. complained that in August of 2008, a TPPP-1 merchant had withdrawn money from his account using a demand draft without his "knowledge or consent."

b.   Also on September 9, 2008 consumer L.T. complained about the same TPPP-1 merchant, which had withdrawn money from her account using a "remotely created check" without her authorization.

These were just two of over 75 complaints for the month of September 2008 regarding unauthorized demand drafts by this TPPP-1 merchant.   Because of Plaza COO's blanket authorization earlier in the year, Plaza had not conducted due diligence or underwriting on this—or any—TPPP-1 merchant.   Each month, the Bank received dozens of sworn and notarized statements from consumers challenging check items submitted by TPPP-1's merchants as unauthorized and fraudulent.

53.   In addition, other banks and credit unions also alerted Plaza to TPPP-1's fraudulent merchants.   For example, an official from the Corporate Security Department of an Alabama-based bank called Plaza Compliance Officer because it "believe[d] there are fraudulent transactions being processed through [Plaza.]"   The official explained that its customers were victims of a "telemarketing scam" by an internet merchant and their accounts were being debited by TPPP-1 through Plaza.   Upon receiving this information, Plaza Compliance Officer attempted to vet this TPPP-1 internet merchant, but she could not find any

information about the company nor contact a company representative.   However, Plaza did not immediately stop TPPP-1 from continuing to process transactions for this merchant.

### iii.        Inquiries From Law Enforcement

54.    As explained by Plaza Compliance Officer in an e-mail to Plaza COO, in early 2009, Plaza also received "several phone calls from law enforcement wanting to subpoena records [and] stating there is fraud going on over [at Plaza]" because of TPPP-1's transactions.

55.    As TPPP-1 and its merchants increased their "questionable" transactions, Plaza Compliance Officer reiterated in an e-mail to Plaza COO that the Bank "receive[d] increased phone calls claiming fraud from other banks, law enforcement officers and consumers."   In 10 days' time in early 2009, Plaza received 37 such calls.

### E.    Even After TPPP-1 Confirms Plaza's Knowledge That Fraudulent Merchants Were Initiating Unauthorized Withdrawals Through The Bank, Plaza Fails To Act.

56.    Plaza knew that TPPP-1 processed transactions not only for merchants, but also for other payment processors, who, in turn, processed for still other processors.   These nested processors, in turn, processed transactions for internet-based companies that were sources of numerous consumer complaints of telemarketing fraud and unauthorized withdrawals.   At times, there were at least three distinct layers of processors between the merchants withdrawing money from consumers' accounts through Plaza and Plaza itself.

57.    Two such internet-based merchants processing through TPPP-1 and other nested processors purportedly offered identity theft protection insurance. They began processing through TPPP-1 and Plaza in February 2009, primarily using demand drafts.   These demand drafts included a simple notation indicating that the withdrawal was authorized via "internet purchase."   Almost immediately, Plaza

began receiving complaints from consumers and their banks about fraudulent withdrawals by these merchants.   In addition, Plaza received more than one hundred notarized consumer affidavits stating that the withdrawals by these two merchants were fraudulent.

58.   On February 27, 2009, Plaza Compliance Officer emailed TPPP-1 CEO requesting information about these two internet-based merchants. Plaza COO was copied on that e-mail.

59.   Later that day, TPPP-1 CEO told Plaza that the company would immediately stop processing for these identity theft protection insurance merchants. TPPP-1 CEO referred to these merchants as "counterfeit" and acknowledged that their remote deposits were "probably fraudulent" and "very high risk."   TPPP-1 CEO acknowledged that there was a "pattern" of unauthorized withdrawals by one of the merchants.   TPPP-1 CEO noted that one of the merchants had an "unprecedented" 56 percent return rate and that he expected the return rate for the merchant to increase to 70 percent.   Compounding the evidence of likely fraud, TPPP-1 CEO admitted that the merchant could not produce any evidence that its transactions had actually been electronically authorized by consumers.

60.   At around the same time, Plaza Compliance Officer e-mailed Plaza COO, informing him about her concerns regarding TPPP-1's activities and recommending that Plaza discontinue allowing TPPP-1 to process transactions through the Bank.   She explained that "I am not comfortable any longer allowing these types of transactions for [a nested payment processor] nor any other payment processing company, especially since the balances anticipated are just not there nor are we collecting sufficient fees for the head ache [sic], work, and possibly [sic] reputational risk associated with servicing such transactions."   She concluded that the anticipated revenue from TPPP-1's accounts was not meeting projections and the relationship was "just not worth all the trouble."

61.   Plaza COO ignored Plaza Compliance Officer's concern and did

not respond.   Plaza continued to permit TPPP-1 to process through its accounts at the Bank.

62.     Two weeks later, in early March 2009, Plaza Compliance Officer again e-mailed Plaza COO to recommend that Plaza terminate TPPP-1's ability to process transactions, whether on its behalf, for its merchant-clients, or for other payment processors.   She reiterated that her recommendation was based on multiple risk factors because "[TPPP-1] is killing us over here."   Plaza Compliance Officer explained that for a one month period "a majority" of over 2,000 "Re-Presentation Check Entry" items processed by TPPP-1 would be returned. Re-Presentation Check Entry items are checks reprocessed after they have already been returned (typically for insufficient funds) through an ACH debit entry.

63.     Plaza Compliance Officer confessed to Plaza COO that she was "very concerned with what the regulators might think about these transactions, especially since it's in our policy that Plaza Bank will not engage in [Check 21] services for payment processors and their recent guidance on Remote Deposit Capture."[3]

64.     Yet again, Plaza COO did not act on Plaza Compliance Officer's recommendation.   Instead, Plaza COO verbally assured Plaza Compliance Officer that he would handle the situation.

65.     In April 2009, Plaza COO informed Plaza Compliance Officer that TPPP-1 would transfer the majority of its processing activities to another bank.

---

[3] In January 2009, the FDIC warned the banking industry about the elevated risks of fraud resulting from the proliferation of remote deposits explaining that "greater customer selectivity" is required because "certain aspects of fraud risk are elevated in an [Remote Deposit Capture] environment."   See FDIC, Risk Management of Remote Deposit Capture, FDIC FIL-09-004 (January 14, 2009).

**F.    As Plaza Negotiates A Sale To New Owners, It Permits TPPP-1 To Increase Its Transactions Through The Bank To New Highs.**

66.    Plaza had operated at a loss since its inception and as a result was undercapitalized.   In danger of being closed by regulators for "unsafe or unsound banking practices," Plaza entered into negotiations to be sold to a private equity firm ("Purchaser").   On or around October 13, 2008, Purchaser entered into a preliminary Stock Purchase Agreement to gain a controlling interest in Plaza.   As a condition of receiving regulatory approval for their purchase, Purchaser was required to install new directors and hire new management to run the Bank.   Plaza and Purchaser anticipated that the sale would be finalized and regulatory approval received by June 2009.[4]

67.    With the impending sale and change in management, TPPP-1 realized its window to the nation's banking system could close when Plaza's new management learned of the suspicious nature of its merchants' transactions.   Thus, despite having informed Plaza just two months earlier in April 2009 that it would move its processing activities to another bank, TPPP-1 increased the volume of processing for its merchant-clients while new management began the process of officially taking over bank operations.   Specifically, TPPP-1 increased the number of processed items from approximately 900 items in May 2009 to more than 6,500 in June 2009 and more than 124,000 by July 2009, which was nearly six times higher than TPPP-1's previous high for monthly transaction volume.   In his notes, Plaza's Chief Financial Officer observed that after May 2009, "[r]eturn items associated with [TPPP-1] accounts spiked."

---

[4] During the course of Purchaser's due diligence, Plaza's board of directors disclosed in its December 2008 Offering Circular that Plaza COO was a founder of TPPP-1.   This information did not dissuade Purchaser from proceeding with the acquisition.

68.     On June 1, 2009, Purchaser received regulatory approval for its investment into and takeover of Plaza.   Concurrently, Purchaser announced the addition of three new members to Plaza's Board of Directors and the hiring of new bank executives, including a new bank president and chief executive officer.

69.     On or around June 8, 2009, Plaza and Plaza COO entered into a separation agreement.   Plaza Chairman signed the contract on behalf of Plaza. Pursuant to the agreement, Plaza COO would serve as a "Transition Officer" until August 5, 2009, and assist with the management changeover.

### VI.   WHILE PLAZA'S NEW MANAGEMENT WEIGHED REVENUE AGAINST RISK, THE BANK CONTINUED TO KNOWINGLY FACILITATE FRAUD AND THEFT FROM CONSUMERS

### A.   Plaza's New Management Immediately Learns That TPPP-1 Is Processing Payments For Fraudulent Merchants.

70.     Within a month of taking over bank operations, the new leadership team became aware of the dubious nature of the transactions TPPP-1 processed through Plaza's accounts.   In July 2009, an investigator with Bank of America contacted Plaza's new president (hereinafter referred to as "Plaza President") and Plaza Compliance Officer about atypically high return rates for transactions originating from Plaza by one of TPPP-1's main merchant-clients, Mike Moneymaker.   Moneymaker operated a number of companies that purportedly offered products such as free VISA cards, free voice mail, free airline tickets, and other products to the public.[5]

---

[5] In reality, these companies fraudulently obtained consumers' banking information and illegally withdrew money from their accounts on a recurring basis, typically using demand drafts.   Eventually, a federal court enjoined Moneymaker from his deceptive business practices and ordered him to pay a civil penalty of more than $9 million.   See FTC v. Michael Bruce Moneymaker, No. 11-cv-00461 (D. Nev. Feb. 1, 2012).

71.     In response to the investigator's inquiry, Plaza President asked the Bank's employees for further information about both TPPP-1 and Moneymaker. He learned that Plaza had little to no information about TPPP-1's merchant-clients, and that those clients used TPPP-1's accounts at Plaza to withdraw money from consumers using what one Plaza employee described as "draft check garbage." Plaza President also learned that TPPP-1's transactions had troublingly high rates of returns.   For example, in July 2009 alone, Moneymaker's companies that processed through Plaza had a return rate of 68 percent.

72.     At the same time, however, Plaza President was informed that the Bank was "enjoying quite a bit of fee income from the returns."   In July 2009, Plaza anticipated approximately $78,000 in Return Item Fees from TPPP-1.   While noting that the income from the return fees was "nice," Plaza's President maintained that he wanted more information about Moneymaker and the reasons for the high return rates of his companies.

73.     In response to the inquiry by Plaza, in August 2009, TPPP-1 CEO informed the Bank that it would terminate processing for one specific Moneymaker company, Belfort Capital Ventures, because of unacceptably high rate of consumer debits returned as unauthorized.   This did not deter Moneymaker; he simply stopped using the name Belfort Capital Ventures to illegally debit consumers' accounts and began submitting withdrawals under the name of another one of his companies that was not yet on Plaza's radar as a front for fraud, Freedom Subscription.

74.     Between July 2009 and December 2009, TPPP-1 processed nearly 300,000 additional transactions totaling approximately $16.3 million dollars for Moneymaker and his companies.

75.     Moneymaker's problematic financial transactions were not the only warning signs Plaza's new management received about TPPP-1's clients during this period.   Also in August 2009, one of the nested payment processors that

used TPPP-1's Plaza accounts e-mailed TPPP-1 CEO, copying Plaza President, about a dispute regarding monies that TPPP-1 was withholding.   In its e-mail, the nested processor admitted that one of its merchants was "guilty of submitting fraudulent transactions."

76.   On or around August 24, 2009, Plaza President specifically learned of Plaza COO and Plaza Chairman's involvement with TPPP-1, and disclosed this information to one of the new board members brought in by Purchaser.

77.   Despite learning this information that tainted the Bank's previous decisions regarding TPPP-1, Plaza did not terminate, or even suspend, TPPP-1's processing capability.   In light of the red flags observed by Plaza's new management, on August 19, 2009, Plaza's Risk Management Committee commissioned its new Chief Banking Officer (hereinafter referred to as "Plaza CBO") to investigate TPPP-1 in greater detail.   Plaza CBO planned on engaging an independent auditor to evaluate the TPPP-1 relationship so that the Bank could weigh the potential revenue against any potential risk.   As memorialized in its meeting notes, the Risk Management Committee was concerned that "the Bank could be liable for the loss" resulting from the "fraud on [a consumer's account]," but there was no mention of the harm to consumers whose money was stolen.

78.   In September 2009, Plaza began identifying TPPP-1's largest merchants by transaction volume and dollar amount and, during this process, learned that they all had "large volume[s] of returns" and associated consumer complaints confirming fraud.

79.   While the Bank continued its evaluation, TPPP-1 continued processing unauthorized withdrawals from consumers' accounts through Plaza. The inevitable returns associated with these unauthorized withdrawals were a substantial revenue generator for the Bank.   For example, in September 2009, TPPP-1 generated over 160,000 returned items; even with a severely reduced rate of

$0.50 per return item, Plaza was due to collect over $83,000 in fee income.

80.     On October 15, 2009, Plaza CBO visited TPPP-1's operations in Santa Ana, California.   He met with (now former) Plaza COO in his role as a consultant for TPPP-1.   In reporting on this meeting to the remaining executive team, Plaza CBO reiterated that TPPP-1 did not, in fact, vet its merchants.   He observed that Moneymaker and his companies were the subject of separate lawsuits by the State Attorneys General of Arkansas, Kentucky, and Indiana for a fraudulent billing scheme that prominently used telemarketing call centers.   TPPP-1 was aware of these lawsuits, but had still permitted Moneymaker to process through its accounts at Plaza.   Plaza CBO also acknowledged that TPPP-1 processed for merchants that were "three or four levels removed" from the Bank.

81.     While this was happening, consumers continued to call Plaza President, Plaza's new CEO, and Plaza Compliance Officer about unauthorized withdrawals originating from Plaza.   Meeting Minutes from Plaza's Board of Directors where it "discussed the [TPPP-1] relationship at length," noted that approximately 90 percent of all the calls that Plaza received were "irate customer complaints" about illegal debits from their bank accounts by TPPP-1's merchants.

82.     Consumers also e-mailed Plaza's new management about illegal withdrawals by TPPP-1's fraudulent merchants.   For example:

a.    Consumer J.C. wrote to Plaza in September 2009 about an internet merchant that twice withdrew money from his account through TPPP-1's account:   "I want to know who the [expletive] this is PLEASE, ASAP, they are taking out this money out of my [expletive] checking account illegally."

b.    Consumer J.B. wrote to Plaza in November 2009 that an internet merchant "is withdrawing monies from my account" and that her attempts to contact the company were "unsuccessful[]."   She noted that she had first contacted another Plaza Bank, which told her that it was "getting many complaints about this."

**B.    Plaza's New Management Finally Decides The Risks Outweigh The Rewards.**

83.    By the fourth quarter of 2009, Plaza's new management concluded that the profits it was earning from TPPP-1's business no longer justified the risk.   On November 19, 2009, Plaza's management reported to the Bank's Board of Directors that, despite the "reasonable fee income," it had decided to slowly wind down the TPPP-1 relationship.

84.    When announced, the decision upset Plaza Chairman—TPPP-1's main Plaza insider following Plaza COO's departure—who was unaware that bank executives were even considering closing TPPP-1's accounts.   The next day, Plaza Chairman e-mailed TPPP-1 CEO "to apologize" for the "embarrass[ment]" of not being able to keep open TPPP-1's access to the nation's banking system.   On December 2, 2009, Plaza Chairman tendered his resignation from Plaza's Board of Directors stating that he felt "an estrangement from some of the recent developments at Plaza Bank."

85.    Although it decided to close TPPP-1's accounts, Plaza did not immediately terminate TPPP-1's ability to process through the Bank.

86.    Plaza CBO and TPPP-1 CEO, among others, collaborated on a plan whereby TPPP-1 would start moving the "higher risk stuff" to another bank, First Bank of Delaware.[6]

---

[6] On November 19, 2012, the U.S. Attorney's Office for the Eastern District of Pennsylvania filed suit against First Bank of Delaware in an action captioned United States v. First Bank of Delaware, Civil Action No. 12-CV-6500 (E.D. Pa.).   The government alleged that First Bank of Delaware engaged in a scheme to defraud consumers by originating electronic-payment transactions knowing that the authorizations for these transactions had not been obtained, or had been obtained using trickery and deceit.   The case was resolved with the bank paying a $15 million fine and surrendering its charter.   The case implicated some of the same fraudulent merchants that processed payments through TPPP-1 and Plaza.

87.    Initially, TPPP-1 assured Plaza that it would step-down the volume of transactions over the course of three months, and that processing volume would stop by March 1, 2010.   In November 2009, TPPP-1 processed approximately 376,000 items through Plaza, and told Plaza that it planned on decreasing that volume to:   185,000 in December, 118,000 in January, and 60,000 in February.

88.    TPPP-1's processing volume did not step down as it had promised.   In fact, transaction volumes were substantially higher than previously claimed by TPPP-1:   214,000 in December, 190,000 in January, and 143,000 in February.

89.    During this period, return rates for TPPP-1's transactions remained as high as 50 percent.   In November 2009, Plaza received over 375,000 returned items in connection with TPPP-1's prior transactions.   Plaza was in line to collect over $180,000 for processing these returned items.

90.    Plaza's delay in terminating TPPP-1's processing activity substantially harmed consumers.   For example, as noted above, Plaza had previously requested that TPPP-1 stop processing for Moneymaker and his company, Belfort Capital Ventures.   In January 2010, Plaza reiterated its request to TPPP-1 CEO that the processor refuse all transactions initiated by Moneymaker and any of his companies.   TPPP-1 assured Plaza that it would comply with this request. However, Plaza did not monitor or halt these transactions.   In fact, TPPP-1 processed thousands of additional fraudulent demand drafts for Moneymaker, contrary to TPPP-1's prior assurances, through April 2010.

91.    The harm caused by Plaza's delay is further highlighted by consumers' continued complaints to Plaza during this time period.   For example, in January 2010:

a.    Consumer E.M. wrote Plaza's president and Plaza Compliance Officer about a fraudulent demand draft that identified Plaza as the

27

originating bank for the illegal withdrawal:   "WE ARE SO UPSET, NOT ONLY ARE WE IN THE MIDDLE OF A BANKRUPTCY BUT THESE FUNDS ARE TO BE USED IN A PAYMENT TO BE SENT IN 2 DAYS.   I AM DEMANDING THAT THIS CHARGE BE REVERSED IMMEDIATELY." (capitalization in original e-mail)

b.      Consumer R.W. wrote to Plaza's president and Plaza Compliance Officer about a TPPP-1 merchant:   "This company fraudulently withdrew $69.95 from my checking account without my authorization and they utilized your bank to do it. . . . This company not only took advantage of me, but of at least ten other unsuspecting victims, who I located on a complaints message board.   I want your bank to be aware that I have reported this company to the FBI-Internet scams department, the Better Business Bureau in Las Vegas, my local police department and my bank. Please be aware that I will also be contacting my local media and the name of your bank may be included, since these people are using it to conduct fraudulent activity."

c.      Consumer J.T. wrote to Plaza's president about the TPPP-1 merchant that was the subject of Consumer R.W.'s complaint:   "One of your customers . . . is in the business of using information from online payday loan applications to write unauthorized checks on their checking accts.   I have filed a complaint with the ic3 [sic] website and the ftc [sic] about this unauthorized check and know by reading other reports that more complaints are being filed.   If there are any more checks written on my accounts from your bank I will have to assume you are in on the scheme and will report you to the proper authorities."

d.      Consumer E.S. wrote to Plaza's president about another TPPP-1 merchant: "I would like to inform you of a problem I am having with one of your check processing customers. . . . My complaint is hardly unique, a Google search . . . will turn up hundreds of similar complaints with not a single positive response from anyone online for this company. The company is creating websites as a ruse to take consumers bank account information and then charge their accounts for valueless website subscription services. . . . I have notified the police . . . the FBI, the FTC, my state's Attorney General, the internet hosting company, several news organizations, my bank and your [] subsidiary [TPPP-1] of what is going on. . . . I realize that my one

28

complaint is not enough, but again a simple web search should provide plenty of evidence supporting my position."

92.    Consumer complaints about TPPP-1's transactions became so voluminous that Plaza developed a response template to respond to aggrieved consumers.   In this stock response, Plaza admitted:

> The unauthorized withdrawal from your account is of great concern to us at Plaza Bank.   Many of us can empathize with your situation, having had similar experiences personally; we regret the inconvenience caused you and want to help resolve the problem expeditiously.
>
> **Our customer, [TPPP-1], processes transactions for third parties and unknown sources, periodically submitting questionable items through their system.** Due to these problem transactions we are in the process of discontinuing accepting items from [TPPP-1].   (emphasis added)

93.    On February 16, 2010, Plaza Chairman wrote to Plaza's Board of Directors on behalf of TPPP-1 requesting "a favor" to extend the winding down deadline of March 1, 2010.

94.    On February 18, 2010, the board approved an extension of the winding down deadline to May 1, 2010, provided TPPP-1 guaranteed sufficient funds to cover the expected returns.

95.    From January 2010 to May 2010, Plaza received approximately 260,000 returned items on average per month, which should have resulted in $130,000.00 in fees from TPPP-1 to Plaza per month.

96.    During the five-month period after the Bank finally decided to terminate its relationship with TPPP-1, Plaza permitted the processor to withdraw an additional $55 million from consumers' accounts.

# COUNT I

## (18 U.S.C. § 1345 – Injunctive Relief)

97.     The United States incorporates by reference paragraphs 1 through 96 as if fully set forth in this paragraph.

98.     Plaza violated the wire fraud statute, 18 U.S.C. § 1343, by participating in a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses with the intent to defraud, using wire communication and there is a substantial likelihood of future violations.

99.     Plaza's conduct constitutes or is likely to constitute a continuing and substantial injury to the United States and its citizens.   Absent injunctive relief, Plaza's conduct presents a reasonable likelihood or a cognizable danger of recurrence.

100.   The United States seeks, pursuant to 18 U.S.C. § 1345(b), a permanent injunction restraining all future fraudulent conduct and any other action that the Court deems just in order to prevent a continuing and substantial injury to the persons and entities affected by the Defendant's fraudulent scheme.

# COUNT II

## (12 U.S.C. § 1833a – Civil Penalties)

101.   The United States incorporates by reference paragraphs 1 through 96 as if fully set forth in this paragraph.

102.   Plaza violated the wire fraud statute, 18 U.S.C. §1343, by participating in a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses with the intent to defraud, using wire communication.

103.   This wire fraud scheme affected numerous federally-insured financial institutions, including the banks of the consumer victims from whom money was taken without authorization, and Plaza itself.

104.   Accordingly, Plaza is liable to the United States for civil

1  penalties as authorized under 12 U.S.C. § 1833a(b).

2  ///

WHEREFORE, the United States requests judgment against Defendant, as follows:

    a.     An injunction under 18 U.S.C. § 1345 enjoining Defendant from processing financial transactions for third-party payment processors it knows or should know is facilitating consumer fraud;

    b.     A judgment imposing a civil penalty against Defendant up to the maximum amount allowed by law; and

///

c.      Such further relief, including but not limited to equitable relief under the Court's inherent powers, as the Court deems just.

DATED:   March 12, 2015                    Respectfully,

BENJAMIN C. MIZER
Acting Assistant Attorney General
JONATHAN F. OLIN
Deputy Assistant Attorney General
Civil Division

MICHAEL S. BLUME
Director
RICHARD GOLDBERG
Assistant Director
Consumer Protection Branch
_____//s//  Sang H. Lee_____
SANG H. LEE
Trial Attorney
Consumer Protection Branch


STEPHANIE K. YONEKURA
Acting United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
_____//s//  Anoiel Khorshid_____
ANOIEL KHORSHID
Assistant United States Attorney

Attorneys for Plaintiff United States of America

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff United States of America hereby demands a trial by jury.

3

4

DATED:   March 12, 2015                    Respectfully,

5

6                                          BENJAMIN C. MIZER
                                           Acting Assistant Attorney General
7                                          JONATHAN F. OLIN
                                           Deputy Assistant Attorney General
8                                          Civil Division

9

10                                         MICHAEL S. BLUME
                                           Director
11                                         RICHARD GOLDBERG
                                           Assistant Director
12                                         Consumer Protection Branch
13                                         _____//s//_Sang H. Lee_____

14                                         SANG H. LEE
                                           Trial Attorney
15                                         Consumer Protection Branch

16

17                                         STEPHANIE K. YONEKURA
                                           Acting United States Attorney
18                                         LEON W. WEIDMAN
19                                         Assistant United States Attorney
                                           Chief, Civil Division
20
21                                         _____//s//_Anoiel Khorshid____

22                                         ANOIEL KHORSHID
                                           Assistant United States Attorney
23
24                                         Attorneys for Plaintiff United States of
                                           America
25

26

27

28

34